IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

ZACKARY ELLIS SANDERS,              )
                                    )
    Petitioner/Defendant,           )
                                    )        Criminal Case No. 1:20-cr-143
    v.                              )        Civil Action No. 1:26-cv-778
                                    )
UNITED STATES OF AMERICA,           )        The Honorable Anthony J. Trenga
                                    )
    Respondent.                     )
                                    )
_____ )

**UNITED STATES' RESPONSE IN OPPOSITION TO PETITIONER'S
MOTION TO VACATE CONVICTIONS UNDER 28 U.S.C. § 2255**

The United States, by and through undersigned counsel, submits this response in opposition

to Zackary Ellis Sanders's motion to vacate his convictions under 28 U.S.C. § 2255. *See* ECF No.

691. For the reasons explained below, Sanders's convictions are constitutional, Sanders did not

receive ineffective assistance of counsel, and this Court should deny the motion in its entirety.

**BACKGROUND**

**I.      Factual Background and Procedural History**

In 2019, a reliable national law enforcement agency in another country (the Foreign Law

Enforcement Agency, or FLA) provided a tip to the Federal Bureau of Investigation advising that,

in May 2019, a specified IP address was "used to access online child sexual abuse and exploitation

material" (or CSAM) with a particular focus on depictions of "BDSM, hurtcore, gore, and death[.]"

*United States v. Sanders*, 107 F.4th 234, 241 (4th Cir. 2024). The FLA explained that this material

was hosted on a "hidden service" site dedicated to such content on the Tor network, which is an

online network designed to mask a user's identifiable IP address by routing the user's

"communications over the Internet through a randomly assigned path of relay computers." *Id.* Given the heightened level of anonymity it offers, the Tor network is sometimes referred to as part of the "dark web." *United States v. Dugan*, 136 F.4th 162, 165 (4th Cir. 2025). The FLA did not advise the FBI how it had identified the IP address from the tip other than to note that it did so lawfully and without searching any computer in the United States. *Sanders*, 107 F.4th at 241.

The FBI traced the IP address to a residence in McLean, Virginia, where Sanders lived with his parents, and obtained a warrant to search the home for child pornography. *Sanders*, 107 F.4th at 242. The agent who prepared the warrant noted in the supporting affidavit that "[t]he FLA advised U.S. law enforcement that it obtained [Sanders's IP address] … through independent investigation that was lawfully authorized in the FLA's country pursuant to its national law"; "[t]he FLA further advised … that the FLA had not interfered with, accessed, searched, or seized any data from any computer in the United States in order to obtain that IP address information"; and "U.S. law enforcement personnel did not participate in the investigative work through which the FLA identified the IP address information provided by the FLA." ECF No. 122 at 4.

The FBI executed the warrant in February 2020 and found a trove of devices containing child pornography in Sanders's bedroom. *Sanders*, 107 F.4th at 243. Two agents asked to speak with Sanders during the search, telling him that he was not under arrest and that speaking with them was entirely voluntary. *Id.* at 243. Sanders agreed to speak with them. When confronted with a flash drive containing CSAM, however, he asked for a break so that he could speak with his mother. *Id.* "The agents promptly brought his mother into the room" and left so that they could speak privately. *Id.* After consulting with his mother for around 15 minutes, Sanders agreed to continue the interview and admitted that he got the CSAM on the flash drive through the Tor network. *Id.* The agents seized Sanders's devices and left without making any arrests. *Id.*

2

An examination of Sanders's devices revealed that his criminal conduct went far beyond accessing CSAM online.  For years, he groomed at least five minor boys to engage in sexually explicit, "BDSM-themed" relationships in which he would instruct the minors to record and send him videos of themselves engaged in degrading sexual conduct while nude.[1]  *Sanders*, 107 F.4th 243-44, 245-46.  Sanders was particularly interested in obtaining videos of these boys "slap[ping] their genitals as hard as they can," although he also instructed them to produce videos in which they "verbally degrad[ed] themselves" and masturbated.  *Id.* at 244 (cleaned up).  Consistent with his apparent interest in sadomasochistic CSAM, Sanders also had multiple videos on his devices depicting the violent rape of young children and infants.  *Id.*  One video, for example, was 19 minutes long and depicted multiple adult men orally and anally raping a bound-and-gagged, 11-year-old boy and then whipping the child with a belt.  ECF No. 4 at ¶ 23.

Sanders was charged by indictment with five counts of production of CSAM, in violation of 18 U.S.C. § 2251(a); six counts of receipt of CSAM, in violation of 18 U.S.C. § 2252(a)(2); and one count of possession of CSAM, to include visual depictions of prepubescent minors and minors under 12 years of age, in violation of 18 U.S.C. § 2252(a)(4)(B).  ECF No. 29.  The pretrial proceedings were marked by extensive motion practice.  Among other motions, Sanders filed a motion to revoke his pretrial detention order (ECF No. 13); multiple motions to compel discovery (ECF Nos. 37, 88, 135, 315, 472); numerous motions to suppress evidence (ECF Nos. 79, 81, 83, 85, 90, 149, 429, 463, 471); several motions *in limine* regarding evidence to be presented at trial (ECF Nos. 153, 155, 160); a motion to modify the agreed-upon protective order (ECF Nos. 229); and many others.  Sanders did not, however, file a timely motion to suppress his statements to the

---

[1] BDSM stands for "bondage, discipline, dominance, submission, sadism, and masochism," and refers to a sexual subculture that embraces those concepts.  *Sanders*, 107 F.4th at 240 n.1.

FBI.  ECF No. 152.  He later moved to suppress those statements on the grounds that they were involuntary and obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), ECF No. 150, but the Court denied the motion as untimely, ECF No. 196.

The case proceeded to trial in October 2021 and the jury returned a verdict of guilty on all counts.  ECF No. 541.  The post-trial period similarly involved numerous unsuccessful defense motions, including a motion for a new trial (ECF No. 575); several supplements to the motion for a new trial, each containing additional exhibits (ECF Nos. 591, 599, 617); and a motion for return of seized property and objecting to forfeiture (ECF No. 607).  Sanders was ultimately sentenced to 216 months' imprisonment, to be followed by a lifetime of supervised release.  ECF No. 621. Sanders then pursued two separate appeals to the Fourth Circuit—one challenging his conviction and sentence, and the other challenging the forfeiture order entered at a separate hearing following sentencing.  Both appeals concluded with published decisions in favor of the government.  *See United States v. Sanders*, 107 F.4th 223 (4th Cir. 2024) (forfeiture order); *United States v. Sanders*, 107 F.4th 234 (4th Cir. 2024) (conviction and sentence).  In the appeal of his conviction and sentence, Sanders argued, *inter alia*, that his statements to the FBI should have been suppressed, that his motion to suppress those statements should have been treated as timely, and that 18 U.S.C. § 3501 required the district court to resolve his voluntariness arguments before trial.  *Sanders*, 107 F.4th at 254-55.  The Fourth Circuit noted that this Court did, in fact, determine that his statements were voluntary before explaining that it, too, was "satisfied" that his statements were voluntary and not the product of a custodial interrogation and that this Court "did not reversibly err in denying the suppression effort as untimely and without good cause."  *Id.* at 255, 255 n.18.

Sanders sought review of both Fourth Circuit opinions in the Supreme Court, but certiorari was denied as to each.  145 S. Ct. 1456 (2025) (forfeiture appeal); 145 S. Ct. 1434 (2025) (appeal

4

of conviction).  On March 22, 2026, Sanders (via newly retained counsel) filed the instant motion to vacate his conviction pursuant to 28 U.S.C. § 2255 on two grounds. ECF No. 691.  First, he contends that "his convictions were imposed in violation of the Constitution" based on "newly discovered evidence" that he believes supports a suppression claim that he raised on direct appeal. *Id.* at 9, 27.  Second, he contends that his trial counsel was constitutionally ineffective for failing to timely move to suppress the statements that he made to the FBI.  *Id.* at 28.

## II.    History of Representation

Sanders has been represented by at least 16 attorneys in connection with this prosecution and his appeals.[2]   For purposes of his ineffective-assistance-of-counsel claim, Sanders was principally represented by three attorneys when the deadline to file pretrial motions expired: Jonathan Jeffress, ECF No. 21; Emily Voshell, ECF No. 18; and Jade Chong-Smith, ECF No. 35.

On April 21, 2026, the Court determined that Sanders had waived attorney-client privilege with respect to Mr. Jeffress and Ms. Voshell and ordered them to provide affidavits responding to Sanders's claim that they provided ineffective assistance of counsel.[3]   ECF No. 698.  Both attorneys provided affidavits, which are attached as exhibits to this filing.

---

[2] As an affidavit from one of Sanders's attorneys makes clear, "other attorneys" beyond those identified on the public dockets likely "worked on his case at various points."  *See* Exh. 1 at ¶ 3. The government is aware, for example, that attorneys working with Sanders's defense team filed numerous FOIA suits based at least in part on discovery materials that were provided in this prosecution.  *See*, *e.g.*, *Sanders v. FBI*, 2022 WL 888191 (D.D.C March 25, 2022); *Michels v. U.S. Dep't of Justice*, 2021 WL 815375, at *3 (D. Colo. Nov. 30, 2021) (describing plaintiff's counsel's "dubious" tactic of filing a "slew" of "duplicative [FOIA] lawsuits" across the country that have "waste[d]" "significant judicial resources").  Accordingly, the government is unable to conclusively identify every attorney who worked on Sanders's defense.

[3] Ms. Chong-Smith no longer works with either Mr. Jeffress or Ms. Voshell and the government was unable to determine her current place of employment or locate any contact information for her.  As Mr. Jeffress's affidavit makes clear, however, he was "the partner on the case" and the "ultimate decision-maker on the strategy" recommended to Sanders.  *See* Exh. 2 at ¶ 6. Accordingly, an affidavit from Ms. Chong-Smith would likely provide little if any additional information relevant to resolving Sanders's ineffective-assistance-of-counsel claim.

## LEGAL STANDARDS

A motion under 28 U.S.C. § 2255 is the "exclusive remedy" for a defendant to challenge his "federal conviction or sentence after the conclusion of the period for direct appeal." *United States v. Ferguson*, 55 F.4th 262, 270 (4th Cir. 2022) (cleaned up). Under § 2255(a), a federal prisoner may move to vacate, set aside, or correct his sentence on the grounds that (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the sentencing Court lacked jurisdiction; (3) the sentence imposed was in excess of the maximum amount authorized by law; or (4) the sentence is "otherwise subject to collateral attack." The defendant bears the burden of proof and must establish by a preponderance of the evidence that he is entitled to the collateral relief sought. *Siers-Hill v. United States*, 467 F. Supp. 3d 406, 414 (E.D. Va. 2020).

"Section 2255 safeguards against miscarriages of justice by allowing for the correction of constitutional, jurisdictional, or other fundamental errors." *Chun-Yu Zhao v. United States*, No. 1:14-cv-1787, 2015 WL 4523487, at *2 (E.D. Va. July 23, 2015) (citing *United States v. Addonizio*, 442 U.S. 178, 185 (1979)). In other words, a § 2255 claim that does not assert a constitutional or jurisdictional error is generally cognizable only if it involves "a fundamental defect which inherently results in a complete miscarriage of justice." *Davis v. United States*, 417 U.S. 333, 346 (1974) (cleaned up). "This standard is only satisfied when a court is presented with exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Alston v. United States*, 290 F. Supp. 3d 542, 546-47 (E.D. Va. 2017).

Claims of ineffective assistance of counsel are cognizable under § 2255. *United States v. Martinez*, 136 F.3d 972, 979-80 (4th Cir. 1998). To prevail on such a claim, a defendant must satisfy the two-pronged test set forth in *Stickland v. Washington*, 466 U.S. 668 (1984). *Strickland*'s "rigorous standard" is "highly demanding," and requires a showing of "gross incompetence" on counsel's part. *Kimmelman v. Morrison*, 477 U.S. 365, 381-82 (1986). A defendant must show

that (1) his counsel's representation fell below "an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 375. Whether a defendant has established the first prong is judged "on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 690. Judicial scrutiny under this prong is "highly deferential," and there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Since there are "countless ways to provide effective assistance in any given case," strategic choices as to how to defend a case are "virtually unchallengeable." *Id.* at 689-90. As to the second prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. If a defendant fails to satisfy either of the two *Strickland* requirements, it is unnecessary for the Court to consider the other prong. *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004) (citing *Williams v. Kelly*, 816 F.2d 939, 946-47 (4th Cir. 1987)).

When a defendant "claims ineffective assistance based on counsel's failure to file a suppression motion," courts in this circuit "apply a refined version of the *Strickland* analysis." *United States v. Pressley*, 990 F.3d 383, 388 (4th Cir. 2021) (cleaned up). On the first prong (the "performance" prong), courts "ask whether the unfiled motion would have had some substance," and, if so, "whether reasonable strategic reasons warranted not filing the motion." *Id.* (cleaned up). On the second prong (the "prejudice" prong), a defendant "must show that: (1) the suppression motion was meritorious and likely would have been granted, and (2) a reasonable probability that granting the motion would have affected the outcome of his trial." *Id.* (cleaned up).

## ARGUMENT

Sanders asserts that he "is entitled to relief under Section 2255" because (1) "his convictions were imposed in violation of the Constitution" and (2) he received ineffective assistance of counsel. ECF No. 691 at 27-28. His first contention relies on a series of inferential

7

leaps that are difficult to summarize, while his second is more straight-forward.  He asserts first that newly discovered evidence has revealed that an agent with Homeland Security Investigations worked with agents from an unspecified number of law-enforcement agencies from around the world to identify two offenders who were using the dark web to distribute material depicting the sexual abuse of infants, that this collaborative effort amounted to a so-called "joint venture" between these law-enforcement agencies that triggers Fourth Amendment scrutiny of their conduct abroad, that the FLA that provided the FBI with a tip about his IP address was also part of this joint venture because it received some unidentified investigative information from one of the other foreign agencies that led to the identification of his IP address, that U.S. law enforcement somehow "active[ly] or substantial[ly] participat[ed]" in the FLA's identification of his IP address, that the identification of his IP address violated the Fourth Amendment, that the evidence recovered from the search of his home pursuant to a warrant based in part on the tip should have been suppressed, and that his convictions must therefore be vacated as unconstitutional.  ECF No. 691 at 6-21. Second, he asserts that his trial counsel was constitutionally ineffective for failing to timely move to suppress the statements that he made to the FBI.  *Id.* at 21-28.  Both claims are meritless.

## I.    Sanders's Renewed Joint-Venture Claim Does Not Warrant Relief

Sanders first argues that his convictions must be vacated as unconstitutional because he has discovered new evidence to support his theory that (1) the FLA that provided the IP-address tip to the FBI obtained the information in the tip in a manner that violated the Fourth Amendment; and (2) the FBI actively or substantially participated in the FLA's identification of his IP address such that the two agencies were in a joint venture and the exclusionary rule for unlawfully obtained evidence should apply extraterritorially to the FLA's conduct.  ECF No. 691 at 6-21.  This claim fails for three independent reasons.  First, Sanders's Fourth Amendment claim is not cognizable

8

on collateral review.  Second, this claim is procedurally barred because he already raised it on direct appeal and the Fourth Circuit rejected it.  And third, this claim fails on the merits.

### A.    Sanders's Fourth Amendment Claim Is Not Cognizable on Collateral Review

Sanders's attempt to litigate a Fourth Amendment challenge in his § 2255 motion is barred by *Stone v. Powell*, 428 U.S. 465 (1976).  In *Stone*, the Supreme Court held that, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Id.* at 494.  In reaching this holding, *Stone* reasoned that the exclusionary rule "is not a personal constitutional right," *id.* at 486, but is instead "a prophylactic device intended generally to deter Fourth Amendment violations by law enforcement officers," *id.* at 479 (cleaned up).  In other words, the Court explained, the exclusionary rule "is calculated to prevent, not repair," and application of the rule should be "restricted to those areas where its remedial objectives are thought most efficaciously served."  *Id.* at 484, 489 (quotation marks and citations omitted).  The Court then "weigh[ed] the utility of the exclusionary rule against the costs of extending it to collateral review of Fourth Amendment claims," and concluded that the marginal deterrence value of applying the exclusionary rule on collateral review "would be outweighed by the acknowledged costs to other values vital to a rational system of criminal justice."  *Id.* at 489, 493.

Numerous courts of appeals have applied *Stone*'s reasoning to § 2255 petitions.  *See United States v. Schulte*, 230 F.3d 1356, at *1 (4th Cir. 2000) (unpublished) ("Once a litigant is provided a full and fair opportunity to litigate a Fourth Amendment claim, he cannot re-litigate the claim in a motion pursuant to § 2255 unless there has been an intervening change in law."); *United States v. Lee Vang Lor*, 706 F.3d 1252, 1257 (10th Cir. 2013) ("We have expanded the *Stone* bar to §

2255 petitions."); *Brock v. United States*, 573 F.3d 497, 500 (7th Cir. 2009) ("This Court has determined that the principles of *Stone* apply equally to § 2255 motions."); *United States v. Ishmael*, 343 F.3d 741, 742 (5th Cir. 2003) (declining to reach "the merits of Ishmael's § 2255 petition" because "he had a full and fair opportunity to litigate his Fourth Amendment claim"); *cf. United States v. Moody*, 4:19-cr-51, 2024 WL 3540988, at *12 (E.D. Va. July 25, 2024) ("[I]f petitioner was already provided a full and fair opportunity to litigate the suppression issue, he cannot re-litigate it in a motion pursuant to § 2255 unless there has been an intervening change in law." (cleaned up)).  Accordingly, an asserted Fourth Amendment violation is not reviewable in a § 2255 motion if the defendant had a full and fair opportunity to litigate the claim.

Sanders omits this analysis entirely from his motion.  He has thus waived any claim that he was denied a full and fair opportunity to litigate his joint-venture claim.  *See United States v. Sutherland*, 103 F.4th 200, 211 (4th Cir. 2024) ("Sutherland's total failure to address that issue in his opening brief constitutes a waiver of any argument that he may have had regarding it.").  Nor could he establish such a claim in his original motion if he had tried.  As detailed above, Sanders filed numerous suppression motions and thus clearly had a full and fair opportunity to press his arguments.  In fact, in several motions, Sanders specifically argued that he had uncovered evidence establishing that the investigation that revealed his IP address was a "joint venture" that included "various US law enforcement agencies" and the FLA, and that the FLA obtained his IP address in a manner that violated the Fourth Amendment.  *See* ECF No. 476 at 1-9; *see also* ECF No. 585 at 25-26 (asserting in a motion for a new trial that the identification of his IP address was the product of a joint venture consisting of the FBI, the FLA, and many other countries).  The district court rejected that claim as meritless, *see* ECF Nos. 615 & 501, and the Fourth Circuit did, as well, *see Sanders*, 107 F.4th at 254 n.16.  He cannot now rely on § 2255 to take yet another bite at the apple.

10

To the extent Sanders suggests that he was denied a full and fair opportunity to litigate his joint-venture claim because he lacked the purportedly new evidence described in his motion, ECF No. 9-15, that suggestion must fail, too. As the Tenth Circuit has explained, "[a] defendant is not deprived of a full and fair opportunity to litigate simply because he does not discover all potentially relevant evidence until after his suppression hearing." *Lee Vang Lor*, 706 F.3d at 1259; *see also Brock*, 573 F.3d at 501 (explaining that a full and fair opportunity does not "require[] that the evidence necessary to make the party's best claim be available by the time of trial"). After all, § 2255 is intended to address the constitutionality of a defendant's detention, and "new evidence related to a suppression motion bears upon neither the habeas petitioner's guilt or innocence *nor* the constitutionality of his detention in federal custody." *Lee Vang Lor*, 706 F.3d at 1258; *see also Brock*, 573 F.3d at 500-01 ("Brock's argument that his Fourth Amendment rights were violated is a constitutional claim, but does not bear upon the constitutionality of Brock's detention."). Rather, to prevail on such a claim on habeas review, a defendant must establish either that he received "ineffective assistance of counsel" with respect to the suppression claim or that the government "conceal[ed]" the purportedly new evidence relevant to his claim. *Id.* at 501; *Lee Vang Lor*, 706 F.3d at 1259. Sanders makes neither assertion here and has therefore waived these arguments.

In any event, such a claim would fail because the purportedly new evidence that Sanders has identified is neither materially new nor relevant to his suppression claim. Indeed, as explained above, Sanders relied on similar information to unsuccessfully press this exact argument in his initial prosecution. And even before he made this argument, the affidavit in support of the warrant to search his home provided him with all the information relevant to his joint-venture claim. The affidavit explained that child-exploitation sites on the Tor network are globally accessible and that their users may be located anywhere in the world; that U.S. and foreign law enforcement agencies

11

therefore sometimes share information with each other to help locate offenders on these sites; that the server hosting the site that Sanders accessed was located outside the United States and was seized by a foreign law enforcement agency in June 2019; that the FLA that identified Sanders's IP address as being used to access material on the site did so independently, lawfully, and without searching any computer in the United States; and that U.S. law enforcement personnel did not participate in the investigative work through which the FLA identified Sanders's IP address. *See* ECF No. 79-6 (Affidavit) at ¶¶ 15, 22, 25; *see also* ECF No. 122 at 3-4. As Sanders seems to recognize, the only inquiry relevant to his suppression claim is whether the FBI "active[ly]" or "substantial[ly]" participated in the alleged foreign search—that is, the FLA's identification of his IP address—such that the exclusionary rule should apply. ECF No. 691 at 8 (quoting *United States v. Abu Ali*, 528 F.3d 210, 228 (4th Cir. 2008)). None of the purportedly new evidence in Sanders's § 2255 motion contradicts the sworn statements in the affidavit that the FLA identified Sanders's IP address independently, lawfully, and without the involvement of U.S. law enforcement. To the contrary, the claims in Sanders's motion confirm what the government has said from the outset: law enforcement agencies sometimes collaborate and share information to identify particularly serious offenders on the dark web, but the FLA that identified his IP address did so on its own. This Court should therefore deny his § 2255 motion on this ground.

### B. Sanders's Claim Is Procedurally Barred Because He Raised it on Direct Appeal

Sanders's attempt to litigate this Fourth Amendment claim on collateral review is also barred because he already raised it. Habeas review is "an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621 (1998) (cleaned up). Accordingly, "[i]t is well-settled that a petitioner cannot 'circumvent a proper ruling ... on direct appeal by re-raising the same challenge in a § 2255 motion.'" *United States v. Caro*, 733 F.

12

App'x 651, 660 (4th Cir. 2018) (quoting *United States v. Dyess*, 730 F.3d 354, 360 (4th Cir. 2013)). As explained above, Sanders pressed the joint-venture claim he raises now on direct appeal, and the Fourth Circuit correctly affirmed the district court's "conclusion that this assertion is pure hopeful speculation." *Sanders*, 107 F.4th at 254 n.16 (quotation marks omitted).

Nor does it matter that Sanders contends that "newly discovered evidence" warrants yet another review of this claim. "To obtain federal habeas corpus relief based upon newly discovered evidence, a petitioner must show that the evidence is relevant to his guilt" and "bears upon the constitutionality of his detention." *Griffin v. Clarke*, No. 1:25-cv-658-LMB, 2015 WL 11117147, at \*2 (E.D. Va. June 1, 2015). As explained above, Sanders's purportedly new evidence satisfies neither requirement. It has no bearing on his guilt whatsoever. It also has no bearing on his suppression claim because it does not contradict the statements in the search-warrant affidavit that the FLA identified his IP address independently, lawfully, and without the involvement of U.S. law enforcement. Those sworn statements defeat Sanders's speculative assertion that the FBI must have somehow directed or substantially participated in the FLA's identification of his IP address. Nor is the purportedly new evidence relevant to the constitutionality of Sanders's detention. As the Seventh Circuit has explained, new evidence related to a Fourth Amendment suppression claim does not bear upon the constitutionality of a defendant's detention "'because the exclusionary rule is a social device for deterring official wrongdoing, not a personal right of defendants.'" *Brock*, 573 F.3d at 501 (quoting *Hampton v. Wyant*, 296 F.3d 560, 562-63 (7th Cir. 2002)); *see also Stone*, 428 U.S. at 486. Accordingly, this Court should deny Sanders's motion on this ground.

## C.   Sanders's Claim Fails on the Merits

Finally, even if this Court considers the merits of Sanders's joint-venture claim, his argument fails. As was often the case in his pretrial motions, Sanders's § 2255 motion attempts to

13

obscure the crux of the legal issue in a thicket of elaborate and "conspiratorial" theories based on a "wishful misreading" of disparate pieces of information.[4]  As best the government can discern, Sanders contends that the Court should have applied the exclusionary rule to information that the FLA independently obtained and provided to the FBI because an HSI agent who was not involved with his case helped an unspecified number of different foreign agencies in different countries apprehend different criminals who were sexually abusing infants and sharing depictions of this abuse on the dark web.[5]  That claim makes no sense.  Fortunately, this Court need not wade into that thicket because it is irrelevant to the joint-venture claim that Sanders actually presents.

Before turning to the merits of Sanders's claim, some additional legal discussion is warranted.  It is well-settled that when a foreign government conducts its own investigation pursuant to its own laws and identifies evidence later shared with U.S. law enforcement, as the FLA did here, that evidence is not governed by the Fourth Amendment.  *See United States v. Valdivia*, 680 F.3d 33, 51 (1st Cir. 2012) (explaining that the exclusionary rule "does not apply to foreign searches and seizures"); *United States v. Getto*, 729 F.3d 221, 227 (2d Cir. 2013) (holding that "suppression is generally not required when the evidence at issue is obtained by foreign law enforcement officials" (quotation marks omitted)); *United States v. Mitrovich*, 95 F.4th 1064, 1068 (7th Cir. 2024) ("[T]he Fourth Amendment generally does not prohibit unreasonable searches conducted entirely by foreign governments."); *United States v. Emmauel*, 565 F.3d 1324, 1330

---

[4] ECF No. 122 at 9 (opinion describing Sanders's claim as "a wishful misreading" of the evidence); ECF No. 369 at 6 (order describing Sanders's claim as "conspiratorial conjecture").

[5] Sanders also references heavily redacted documents he obtained in FOIA suits that make no mention of the FLA that identified his IP address.  ECF No. 691 at 13-14.  He does not explain how these documents support his claim that the FLA identified his IP address at the FBI's direction and in a manner that violated the Fourth Amendment.  Accordingly, this Court should disregard his assertion that these documents constitute new evidence material to his suppression claim.

(11th Cir. 2009) (same).  This rule is an expansive one, applying even where the foreign conduct "would not otherwise comply with United States laws or the law of the foreign country," *Emmanuel*, 565 F.3d at 1330, or where U.S. law enforcement was "present and cooperat[ing] in some degree" with the foreign officials, *United States v. Behety*, 32 F.3d 503, 510 (11th Cir. 1994). Some courts, however, have recognized two narrow exceptions to this rule: "(1) where the conduct of foreign police shocks the judicial conscience, or (2) where American agents participated in the foreign search, or the foreign officers acted as agents for their American counterparts."[6] *Valdivia*, 680 F.3d at 51; *United States v. Pierson*, 73 F.4th 582, 590 (8th Cir. 2023) ("For a true joint venture to have occurred, United States officials must have been controlling or directing the conduct of the foreign parallel investigation." (cleaned up)).  The Fourth Circuit has not explicitly adopted these two exceptions, but it has applied the joint-venture doctrine to hold that a defendant's statement obtained abroad by foreign police in violation of *Miranda* should be suppressed if "United States law enforcement agents actively participate[d] in questioning conducted by foreign authorities." *Abu Ali*, 528 F.3d at 228; *id.* at 229 (noting that a joint venture requires "active" or "substantial" participation on the part of the U.S. government in the challenged search or interrogation).

As the Fourth Circuit made clear in *Abu Ali*, the critical inquiry in determining whether to apply the exclusionary rule to evidence obtained by a foreign government is whether U.S. law enforcement actively or substantially participated in the investigative search that yielded the challenged evidence.  *Id.* at 228-29 (focusing on U.S. presence at an interrogation in which the defendant made incriminating statements).  The Fourth Circuit reiterated this view in *United States v. Dugan*, 136 F.4th 162 (4th Cir. 2025).  The facts of that case are exceedingly similar to the facts here.  In *Dugan*, a foreign law enforcement agency identified the defendant's IP address as being

---

[6] Sanders does not claim that the identification of his IP address "shocks the judicial conscience."

15

used to access a child-exploitation site and the FBI relied on that information in seeking a warrant to search the defendant's home (the execution of which uncovered thousands of images of CSAM). *Id.* at 165-67.  The defendant moved to compel the production of unspecified evidence that he hoped would establish that the foreign agency "conducted an unlawful search of his personal computer" to identify his IP address and that the Fourth Amendment applies to the foreign agency's conduct because it "was acting in a joint venture with the FBI." *Id.* at 169-70.  In finding that there was no "evidentiary support" for the defendant's joint-venture theory, the Fourth Circuit did not look to the FBI's relationship with the foreign agency as whole, or to its relationship with any other foreign agencies in combatting the global scourge of online child sexual exploitation. *Id.* at 170.  Instead, the Court considered the nature of the challenged evidence—the defendant's IP address—and explained that there could not be a joint venture between the FBI and the foreign agency that identified his IP address because "the foreign agency did not disclose the details of its investigation to the FBI" and "the FBI had no additional information regarding how [the defendant's] IP address had been obtained[.]" *Id.* at 170-71.

This Court should follow *Dugan.*  The only evidence that Sanders maintains was obtained unlawfully is the FLA's identification of his IP address.  This Court therefore need not disentangle Sanders's winding theory as to how an HSI agent's efforts to help track down two individuals in different countries who were engaged in horrific criminal conduct involving the wide-scale sexual abuse of infants somehow amounted to a global conspiracy to violate his Fourth Amendment rights.  Instead, the only inquiry relevant here is whether the FBI actively or substantially participated in the FLA's identification of his IP address.  The answer to that question is no, and nothing about Sanders's purportedly new evidence undermines that conclusion.

16

Indeed, as explained above, the search-warrant affidavit specifically states that U.S. law enforcement did not participate in the investigative work through which the FLA identified Sanders's IP address. Dissatisfied with that answer, Sanders constructs an alternate investigation in which the FBI (or some other U.S. law enforcement agency) directed the FLA to search his computer and identify his IP address. But he has never produced any evidence to corroborate that speculative theory. Even now, Sanders is unable to point to a single piece of evidence that contradicts the sworn statement in the search-warrant affidavit that U.S. law enforcement did not participate in the FLA's identification of his IP address. In fact, the majority of his "newly discovered evidence" does not even mention the FLA, let alone its identification of his IP address. To be sure, he has apparently identified one document—a translation of what appears to be a decision from a Brazilian tribunal—indicating that *Brazil* shared evidence from a server hosting a child-pornography site with the FLA's home country. ECF No. 691 at 11-12. Even accepting his description of this document, that falls woefully short of establishing that the *United States* somehow directed or even participated in the FLA's identification of his IP address. *Cf. United States v. Derewal*, 703 F. Supp. 372, 375 (E.D. Pa. 1989) ("Merely supplying a tip to a foreign law enforcement agency, which then conducts an investigation and search leading to an American prosecution does not amount to a 'joint venture'."); *United States v. Flath*, 845 F. Supp. 2d 951, 957-59 (E.D. Wis. 2012) (finding no substantial participation where U.S. agents provided initial information and were present for the foreign search and seizure of a U.S. citizen's computer).

At bottom, then, the evidence indicates only that the FLA conducted its own investigation that identified Sanders's IP addresses as being used in May 2019 to access CSAM on the dark web and also received some information from another country about the site that Sanders accessed in

17

June 2019.[7]  Given the nature of the dark web, the FLA likely had no way of knowing before it identified Sanders's IP address where in the world he was located.  For that same reason, U.S. law enforcement would not have been able to direct the FLA to identify Sanders's IP address.  But it is clear that when the FLA did identify Sanders's IP address and determined that he was in the United States, it shared that information with the FBI.  That sort of routine transmittal of potentially valuable information does not establish a joint venture.  *See United States v. Morrow*, 537 F.2d 120, 140 (5th Cir. 1976) ("Criminal conspiracies ... are sometimes international in scope, and the routine transmittal of the name and telephone number of a possibly valuable informant across national borders clearly is permissible under the fourth amendment.").  Because "[n]ormal lines of communication between the law enforcement agencies of different countries are beneficial without question and are to be encouraged," this Court should reject Sanders's claim that the FLA's sharing of his U.S.-based IP address with the FBI gave rise to a joint venture.  *Id.*; *see also United States v. Spearman*, --- F.4th ---, 2026 WL 1753613, at 9-10 (11th Cir. 2026) (rejecting as speculative defendant's joint-venture theory based on "conclusory" allegations that FBI was in a "partnership" with a foreign agency" and "knew of and acquiesced" to the foreign agency's identification of his IP address); *United States v. Kiejzo*, No. 4:20-cr-40036-TSH, 2023 WL 2601577, at *8 (D. Mass. March 21, 2023) (finding no joint venture where defendant offered no evidence that U.S. law enforcement was involved with foreign government's identification of his IP address); *United States v. Bridges*, No. 2:25-cr-00030, 2026 WL 1223679 at *4 (D. Me. May 5, 2026) (same).  A contrary determination—besides being against the weight of applicable authority—would chill the

---

[7] Sanders stresses that these two events are related, ECF No. 691 at 10-11, but he does not explain how Brazil providing information about a site to the FLA in June 2019 prompted the FLA to identify his IP address as being used to access that site a month earlier.  In any event, any such effort would be rank speculation because U.S. law enforcement did not participate in the FLA's investigation nor did the FLA tell U.S. law enforcement how it identified Sanders's IP address.

kind of international information-sharing that has been critical to efforts to detect and dismantle predatory networks whose conduct transcends national boundaries. Sanders offers no reason to invite that consequence here.

Finally, even if U.S. law enforcement actively or substantially participated in the FLA's identification of Sanders's IP address such that the Fourth Amendment should apply to that conduct, suppression is still unwarranted. As an initial matter, the FLA advised that it did not search a computer in the United States to identify Sanders's IP address, meaning that there was no Fourth Amendment violation in the first place. *See* ECF No. 122 at 2-4. Moreover, the good-faith exception precludes suppression. Under the good-faith exception, courts decline to suppress evidence when suppression would not deter law-enforcement misconduct—i.e., when law enforcement acted reasonably and in good faith. *See United States v. Doyle*, 650 F.3d 460, 466-67 (4th Cir. 2011). And in this case, the FBI reasonably relied in good faith on the FLA's assurance that it complied with its own laws and did not search a U.S. computer to identify Sanders's IP address. *See United States v. Benoit*, 730 F.3d 280, 285 (3d Cir. 2013) (finding that the U.S. was entitled to rely on information from known foreign agency). Suppressing evidence recovered from Sanders's home under a joint-venture theory would therefore have no legitimate deterrent effect on any alleged misconduct. *See United States v. Ferguson*, 508 F. Supp. 2d 1, 6 (D.D.C. 2007) ("The good faith exception to the exclusionary rule applies if United States law enforcement agents have a reasonable belief that the foreign nation's laws were complied with."). It would certainly have no effect on the FLA that actually identified his IP address. And any deterrent effect on the FBI—which simply relied on the FLA's tip, based on its unambiguous assertion as to the legality of its investigation, to initiate its own CSAM investigation—would be substantially outweighed by the social costs of depriving the United States of the opportunity to present probative evidence

19

of Sanders's serious criminal conduct and hampering the FBI's ability to act on similarly reliable tips in the future.  Accordingly, even if this Court accepts Sanders's joint-venture theory and his speculation about the FLA's investigation, that theory would not render his convictions unconstitutional.

Because Sanders has failed to satisfy his burden of proving that his convictions were unconstitutionally imposed, this Court should deny his § 2255 motion on this ground.  Further, because the briefing and the record "conclusively show" that Sanders is not entitled to relief, the Court need not hold a hearing before denying his requested relied.[8]  18 U.S.C. § 2255(b).

## II.      Sanders Did Not Receive Ineffective Assistance of Counsel

Sanders next argues that his convictions should be vacated "based on the ineffective assistance of trial counsel in failing to timely move to suppress" the statements that he made to the FBI during the search of his home.  ECF No. 691 at 21-28.  The thrust of his claim is that the suppression arguments in his untimely motion had "'some substance,'" the motion likely would have been granted had it been timely filed, and there is a "reasonable probability" that granting the motion would have affected the trial outcome.  *Id.* (citing *Grueninger v. Dir., Virginia Dep't of Corr.*, 813 F.3d 517, 524-25 (4th Cir. 2016)).  This claim fails at every turn.

---

[8] Sanders raises several other meritless claims.  He asserts, for example, that he had a reasonable expectation of privacy in his IP address on the Tor network and that the FLA must have conducted a Fourth Amendment search to identify his IP address.  ECF No. 691 at 16-21.  That first claim is wrong, *see, e.g.*, *Mitrovich*, 95 F.4th at 1068, and the second one lacks any evidentiary support.  In fact, as the Court recognized before trial in this case, the FBI is aware of ways to de-anonymize a user's IP address on the Tor network without searching his computer, which makes Sanders's assertion that the U.S. government must have ordered a foreign government to conduct a warrantless search of his computer and electronic communications all the more implausible.  ECF No. 122 at 14 n.11; *cf. Dugan*, 136 F.4th at 170 (describing manner in which an individual's IP address could be identified over the Tor network).  In any event, this Court need not resolve these issues because Sanders has failed to establish the existence of a joint venture.

As noted above, the attorneys who represented Sanders during the suppression litigation provided affidavits responding to Sanders's claim. Ms. Voshell explained that she does not recall why they filed the suppression motion when they did, but that Mr. Jeffress "was in charge of all strategy decisions, including what motions to file and when to file those motions." Exh. 1 at ¶¶ 5, 10. Mr. Jeffress, for his part, explained that he worked with Sanders to develop a trial strategy and that they originally decided to "challenge the case exclusively on Fourth Amendment grounds" and, if those arguments failed, seek to plead guilty in a manner that preserved Sanders's ability to appeal any adverse suppression ruling. Exh. 2 at ¶¶ 6-11. Given "the strength and nature of the evidence," Mr. Jeffress continued, the defense team (including Sanders, at least initially) concluded that it would be "a terrible idea" to go to trial and that Sanders would fare better at sentencing and on appeal if he pleaded guilty pursuant to a conditional plea agreement that limited the amount of evidence of his criminal conduct in the record. *Id.* at ¶¶ 8-15. Mr. Jeffress also thought that any motion to suppress Sanders's statements would not succeed and that any "erroneous admission" of those statements would be deemed harmless and not result in a new trial given the strength of the government's evidence. *Id.* at ¶ 14. According to Mr. Jeffress, Sanders changed his mind after the Court rejected his Fourth Amendment claims and Mr. Jeffress decided to file the untimely suppression motion once he realized that Sanders was planning to disregard his advice against proceeding to trial. *Id.* at ¶ 13. Sanders has provided no affidavit addressing or refuting Mr. Jeffress's recollection of events. Accordingly, and against this factual backdrop, Sanders's claim of ineffective assistance of counsel fails.

### A. Sanders Has Not Satisfied *Strickland*'s "Performance" Prong

With respect to the "performance" prong of the *Strickland* test, Sanders's suppression arguments do not have "some substance." *Pressley*, 990 F.3d at 388. In fact, even though

Sanders's suppression motion was denied as untimely, both this Court and the Fourth Circuit nevertheless reviewed the record and determined that Sanders's statements were voluntary and not the product of a "custodial interrogation." *Sanders*, 107 F.4th at 255 n.18 (concluding "based on 'the totality of the circumstances'" that "Sanders's Fifth Amendment rights were not violated"); ECF No. 492 at 22 n.13; ECF No. 402 at 6 n.4. That was the right call. While Sanders initially locked himself in his bedroom with a knife at the outset of the search—requiring some officers to draw their weapons—he was not restrained during the interview. ECF No. 559 (Transcript, Trial Day 5) at 21-22, 55-56. Instead, he was in a home office with a see-through door that was neither locked nor obstructed, was told that he was not under arrest nor obligated to speak to the FBI, and was permitted to pause the interview so that he could privately consult with a trusted relative before deciding whether to proceed. *Id.* at 23, 33-35. The agents did not raise their voices or unholster their weapons during the interview, nor did Sanders ask for counsel. *Id.* at 32, 90. And while Sanders now complains that the agents cautioned that they had to take devices that they could not "clear" of CSAM on-scene, ECF No. 691 at 25, that accurate description of what the warrant authorized was not a "threat" designed to extract a confession. *See United States v. Holmes*, 670 F.3d 586, 592-93 (4th Cir. 2012) (citing "[n]umerous cases" reiterating that "statements by law enforcement officers that are merely 'uncomfortable' or create a 'predicament' for a defendant are not ipso facto coercive"); *cf. United States v. Giddins*, 858 F.3d 870, 882-83 (4th Cir. 2017) (finding coercion where "the interview took place in a police station under false pretenses that [the defendant] was required to submit to questioning in order to have his vehicle returned to him"). It was simply a truthful explanation that Sanders could assist the FBI's search by providing access to his devices. *See United States v. Braxton*, 112 F.3d 777, 782 (4th Cir. 1997) (holding "truthful statements about the defendant's predicament are not the type of coercion that threatens to render

22

a statement involuntary" (cleaned up)).    As both this Court and the Fourth Circuit already recognized, Sanders's claims to the contrary are meritless.

But even assuming that Sanders's claims have "some substance," Mr. Jeffress's affidavit makes clear that that the decision not to file a timely suppression motion was the kind of reasonable "strategic" choice that is "virtually unchallengeable" on collateral review.[9]  *Strickland*, 466 U.S. at 690.  As Mr. Jeffress explained, in his view, Sanders would have fared better at sentencing and on appeal if he confined his case to purely legal and case-dispositive questions about whether there was probable cause to search his residence and limited the amount of detailed information in the record about his sexual exploitation of numerous children.  Mr. Jeffress further correctly determined that, given the nature of the evidence—which consisted largely of text messages and videos recovered directly from Sanders's devices—the suppression of Sanders's statements would not have required the government to dismiss the case.  And for that same reason, Mr. Jeffress also correctly determined that any erroneous admission of those statements at trial would be deemed harmless.  Mr. Jeffress only moved to suppress Sanders's statements once Sanders made clear— after the deadline to file pretrial motions had expired—that he would be disregarding Mr. Jeffress's reasonable advice to enter a conditional guilty plea.  Given the "wide latitude counsel must have in making tactical decisions," Mr. Jeffress's reasonable explanation of why the defense did not timely move to suppress Sanders's statements defeats Sanders's claim that he received constitutionally deficient counsel.  *Grueninger*, 813 F.3d at 529 (quoting *Strickland*, 466 U.S. at 689); *see also Scott v. United States*, 2018 WL 1545586, at *11 (E.D. Va. March 29, 2018)

---

[9] When addressing the "performance" prong, Sanders argues only that his suppression claim has "some substance."  ECF No. 691 at 23-24.  As the Fourth Circuit has made clear, however, the performance analysis in this context is two-fold: "If the motion would have had some substance, then we ask whether reasonable strategic reasons warranted not filing the motion."  *Pressley*, 990 F.3d at 388.  His failure to address this second part of the performance analysis is fatal to his claim.

(rejecting claim where petitioner did not "present[] any evidence to overcome this Court's presumption" that defense counsel's decision was "sound trial strategy").

### B. Sanders Has Not Satisfied *Strickland*'s "Prejudice" Prong

While Sanders's failure to satisfy the "performance" prong of the *Strickland* analysis dooms his ineffective-assistance-of-counsel claim, his claim likewise fails under *Strickland*'s "prejudice" prong for largely the same reasons. As noted above, both this Court and the Fourth Circuit (and even Sanders's trial counsel) determined that Sanders's motion to suppress his statements would have failed if he had timely filed it, meaning that Sanders cannot show that "the suppression motion was meritorious and likely would have been granted." *Pressley*, 990 F.3d at 388 (cleaned up). And even if this motion had some merit, there is no probability—much less a "reasonable" one—that granting it would have affected the outcome of Sanders's trial. *Id.* As Mr. Jeffress explained, the overwhelming strength of the government's evidence would have rendered any erroneous admission of Sanders's statements at trial harmless. Exh. 2 at ¶ 14.

Moreover, and contrary to Sanders's suggestion, "[h]is guilt or innocence" was not "wholly dependent" on the government being able to demonstrate that he lied to the FBI in the interview. ECF No. 691 at 26-27. To the contrary, the jury convicted Sanders of possessing CSAM because the evidence established that there was CSAM on electronic devices scattered throughout his bedroom—and only his bedroom—in his parent's home. *See* ECF No. 606 at 10-11 (describing evidence of Sanders's possession of videos depicting violent child rape on multiple devices). In fact, Sanders admitted in his trial testimony that he downloaded the "disturbing" content found on these devices. *Id.* The jury further convicted Sanders of producing and receiving CSAM because his text messages to the minor victims, which were admitted at trial, established that he was instructing these minors to engage in specific acts of sexually explicit conduct for the express

24

purpose of producing visual depictions of the conduct.[10] *See* 18 U.S.C. §§ 2251(a), 2256(2)(A)(iv) (defining "sexually explicit conduct" to include "sadistic or masochistic abuse").  In one text, for example, he wrote to a minor: "Good boy. Now for your punishment. You're going to slap yourself on your balls as hard as you can 40 times. You will record yourself doing this and then send me the video."  ECF No. 4 at ¶ 21; *see also* ECF No. 606 at 3-10 (describing evidence supporting Sanders's convictions under 18 U.S.C. § 2251(a)).  Sanders's trial testimony further confirmed his criminal motivations.  As he acknowledged, he had these minors record themselves engaging in what he referred to as "cock and ball torture" because he wanted to make sure they had done what he ordered them to do.  ECF No. 604 at 6-7; *see also* ECF No. 559 (Transcript, Trial Day 5) at 182-83.  Sanders's deeply misguided and offensive belief—which he apparently maintains to this day—that he ordered these children to record themselves "tortur[ing]" their exposed genitals for a non-criminal and even laudatory purpose simply has no bearing on whether the jury could find

---

[10] Contrary to the suggestion in his § 2255 motion, Sanders's defense was far less straight-forward than simply (and counterintuitively) arguing that the creation of a visual depiction was "incidental" to his purpose in having minors record themselves engaging in sadomasochistic sex acts. ECF No. 691 at 26-27.  At trial, he testified about his interest in BDSM "power exchange relationships," in which he is the dominant partner (the "dom," "sir," or "master") controlling a submissive partner (a "sub," "boy," or "slave").  ECF No. 559 (Transcript, Trial Day 5) at 139-40.  He admitted to chatting with minors and ordering them to record themselves engaging in his desired conduct but claimed that it was consensual.  ECF No. 560 (Transcript, Trial Day 6) at 35-42.  He further claimed that he was "protect[ing]" one of the minors, and that his exploitation of this victim was for the minor's "own good" and so that the minor could "live his best life."  *Id.*  He also testified that he did not view the CSAM that he produced as depicting sexual conduct, but rather BDSM "punishment[s]," like the "cock and ball torture" videos in which the minors struck their genitals. ECF No. 559 at 183.  He claimed that his "purpose" in ordering the minors to do this was to make them do something "painful," and his "purpose" in having them record it was "to see that they had actually done something that [he] told them to do."  *Id.*  Then, in closing, he argued that it was "absolutely clear" that "each of these minors was interested in engaging in these types of relationships" and even went so far as to argue that one minor "wanted to be raped."  ECF No. 560 at 170-71.  The jury unsurprisingly rejected this bizarre defense, and the Fourth Circuit affirmed that Sanders's alarming views about whether a minor can consent to being his sexual "slave" were irrelevant to his guilt.  *Sanders*, 107 F.4th at 259.

that he ordered them to record themselves engaging in that conduct in the first place.  Given Sanders's trial strategy and the overwhelming strength of the government's evidence, the introduction of Sander's statements to the FBI could not have affected the jury's verdict.  His motion to vacate his convictions on this ground should be denied.

## CONCLUSION

For the foregoing reasons, this Court should deny Sanders's motion to vacate his convictions pursuant to 28 U.S.C. § 2255.[11]  ECF No. 691.

Respectfully submitted,

TODD W. BLANCHE
ACTING ATTORNEY GENERAL

By: _____/s/_____

Seth Schlessinger
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3988
Fax: (703) 299-3980
Email: Seth.Schlessinger@usdoj.gov

---

[11] Because the record includes all the evidence relevant to resolving Sanders's two claims and conclusively shows that Sanders is not entitled to relief, this Court need not hold an evidentiary hearing before dismissing his § 2255 motion.  *See United States v. Davis*, No. 17-cr-196-TSE, 2023 WL 2564335, at * 5 (E.D. Va. March 16, 2023).  Further, because Sanders has not made a "substantial showing of the denial of a constitutional right," this Court should also decline to issue a certificate of appealability.  28 U.S.C. § 2253(c).

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on June 18, 2026, I filed the foregoing document with the Clerk of Court

and further caused a copy of the document to be electronically served upon all counsel of record

via CM/ECF.

        /s/

Seth Schlessinger
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3988
Fax: (703) 299-3980
Email: Seth.Schlessinger@usdoj.gov
